The State of Kansas, *ex rel. C. C. Coleman, as At-torney-general,* v. The Western Union Telegraph Company.*

No. 14,636   (90 Pac. 299.)

SYLLABUS BY THE COURT.

1. Foreign Corporations—*Conditions Imposed by the State—Police Power.* The act of the legislature of 1898, commonly known as the Bush act (Laws 1898, ch. 10), requiring foreign corporations to comply with certain conditions, including the payment of charter fees computed upon the amount of their authorized capital stock, for the privilege of exercising their franchises within the state, was enacted primarily to protect the people of the state from imposition, deception, fraud and wrong arising from the abuse of corporate privileges and the mismanagement of corporate affairs, and is a measure which the state had authority to adopt under the police power which has been reserved to it.

2. —— *Charter Fee.* The requirement of the law that a charter fee be paid fixes one of the conditions precedent to the granting of permission to a foreign corporation to do business within the state. It levies no tax upon property or franchises, is not an attempt to extend the taxing power of the state to subjects outside of its jurisdiction, and does not affect the character of the act as a police regulation, although it may produce some revenue.

3. —— *Conditions Imposed Apply Only to Domestic Business.* The provision of the Bush act that "any corporation organized under the laws of any other state, territory or foreign country and seeking to do business in this state" (Laws 1898, ch. 10, § 2) shall perform the conditions precedent required of it before obtaining permission to do business in this state is to be interpreted in subordination to the provisions of the constitution of the United States, and as intended to apply to subjects within the lawful jurisdiction of the legislature; and so interpreted the law has no application to interstate commerce carried on by foreign corporations, or to business transacted for the federal government, and foreign corporations may engage in such commerce and transact such business in this state without observing any of the requirements of the act.

4. —— *Conditions Apply to All Corporations Doing Intrastate*

* Pending in the supreme court of the United States on a writ of error allowed June 10, 1907.

39—75 KAN.

*Business.* The generally inclusive terms of the Bush act are to be interpreted with reference to the state's plenary power over its purely internal commerce, and over foreign corporations seeking to engage in such commerce; and so interpreted the law applies to all foreign corporations not engaged in interstate commerce or business for the federal government, and to all foreign corporations engaged in interstate commerce or business for the federal government to the extent that they must comply with its requirements in order to engage in non-governmental intrastate business.

5. —————— *Ouster.* For failure to comply with the law a foreign corporation engaged in interstate commerce and transacting business for the federal government may be ousted from the privilege of engaging in non-governmental intrastate business.

6. —————— *Interstate Commerce Not Affected.* The law is not obnoxious to the provision of the constitution of the United States granting to congress the exclusive power to regulate commerce between the states and with foreign nations.

7. —————— *Corporations Doing Business in the State when the Statute Took Effect.* It was the intention of the legislature that the law should apply to foreign corporations which were doing business in the state at the time it took effect.

8. —————— *Exemption from the Operation of the Law—Vested Rights.* Foreign corporations which as a matter of comity have been permitted to enter a state, or a territory which afterward becomes a state, without restriction, have no vested right to remain there unlicensed, and must secure an express exemption or exemption by implication equally clear with express words or they will be subject to all subsequent regulations which the state may see fit to adopt in the exercise of its police power.

9. TELEGRAPH COMPANIES—*Foreign Corporation—Regulation by the State.* Although the Western Union Telegraph Company, a corporation of New York, came into the region now included within the state's boundaries when it was yet a territory of the United States, has remained here ever since, has enjoyed the protection of general laws and the advantages of certain acts passed for the special benefit of telegraph companies, and has expended large sums of money in equipping itself to supply the need of the people of Kansas for means of telegraphic communication, it is subject to the provisions of the Bush act.

10. —————— *Police Powers of the State—Limitation.* Foreign telegraph companies are not only subject to the provisions of

the Bush act, but the state has authority under its police power to make and enforce all local regulations of their business in the state which the public comfort, convenience and welfare render necessary, provided only such regulations do not directly impinge upon interstate commerce or governmental business.

11. —— *Doing Intrastate Business Not Compulsory.* The statute of Kansas requiring telegraph companies, under a penalty, to establish and maintain stations at county seats traversed by their lines, with the usual appointments and facilities for the convenience of the public in sending telegrams, and other statutes regulating the business of the Western Union Telegraph Company in Kansas, do not compel it to continue the conduct of non-governmental intrastate business notwithstanding the Bush act, and it may freely withdraw from such business to avoid payment of the charter fee prescribed by that act.

12. —— *Effect of Authority Granted by Congress.* The Western Union Telegraph Company is not relieved from the conditions of the Bush act because of its acceptance of the restrictions and obligations contained in the act of congress of July 24, 1866, granting it permission to construct and operate its lines over the public domain and navigable waters of the United States and along the military and post-roads of the United States.

13. CORPORATIONS—*Local and Foreign—Equal Protection of the Law.* Although the state had authority to prefer its own corporations in granting the right to exercise corporate franchises within its limits, the Bush act requires that both foreign and domestic corporations shall pay, before being authorized to do business, a charter fee computed at a fixed rate upon the amount of their authorized capital stock, irrespective of where such capital may be employed; and such requirement does not deprive foreign corporations of the equal protection of the laws, although the bulk of their capital may be invested in property outside the state.

14. TELEGRAPH COMPANIES—*Ouster from Doing Local Business —Interstate Commerce.* A judgment of ouster from local non-governmental business against the Western Union Telegraph Company because it has not complied with the Bush act will not constitute a regulation of interstate commerce or of government business, although the receipts at many offices from interstate and government business alone are not sufficient to keep them open.

15. —— *Due Process of Law.* A judgment of ouster from local non-governmental business for failure to comply with

the Bush act will not deprive the Western Union Telegraph Company of property without due process of law, although many of its offices must be closed and its poles and wires are not removable without great loss.

Original proceeding in *quo warranto.* Opinion filed May 11, 1907. Judgment of ouster.

*C. C. Coleman,* attorney-general, and *Fred S. Jackson,* assistant attorney-general, for The State.

*Rossington & Smith,* and *Henry D. Estabrook,* for defendant; *John F. Dillon, Rush Taggart,* and *George H. Fearons,* of counsel.

The opinion of the court was delivered by

BURCH, J.: The state, on the relation of the attorney-general, brings this action to oust the defendant from the exercise of the corporate franchise of receiving, transmitting and delivering intrastate telegraphic messages for pay. The defendant is a foreign corporation, and the action is predicated upon its refusal to pay the charter fee prescribed by section 6 of chapter 10 of the Laws of 1898, as amended by section 1 of chapter 125 of the Laws of 1901 (Gen. Stat. 1901, § 1264), which payment is made a condition precedent to the granting of authority to do business within this state. The defense is that the law referred to, commonly known as the Bush act, was not intended to apply to the defendant or the portion of its business affected by this suit; but, if such were the intention of the legislature, the statute invades rights secured to the defendant by the constitution of the United States and by paramount laws enacted in pursuance thereof.

The cause is submitted upon a demurrer to the defendant's answer. From the admissions and affirmative allegations contained in the answer it appears that the defendant is a corporation with a capital stock of $100,000,000, organized and existing under and by virtue of the laws of the state of New York for the purpose of transacting a general telegraph business.

It receives and transmits messages and communications by means of the electric telegraph over and upon wires connecting various points within the state of Kansas, and connecting points in the state of Kansas with points in other states of the United States, in the territories of the United States and in foreign countries. It has agents and stations in more than eight hundred cities in Kansas and transacts a large business within the state on behalf of its citizens. It came into the region now embraced within the state's boundaries while Kansas was yet a territory of the United States, and has prosecuted its business here ever since. It has been the beneficiary of numerous general laws enacted to promote the interests of telegraph companies, and claims an invitation from the territory of Kansas to enter its domain, occupy its highways with poles and wires, extend lines and locate stations wherever the public interest may demand and serve the people by supplying their need for means of telegraphic communication. In response to this invitation it has expended large sums of money in the construction of lines, in establishing offices and otherwise in equipping itself for the discharge of its duties as a public-service corporation.

The answer further discloses that in the year 1905 the defendant made application to the state charter board for permission to engage in business in the state, expressly reserving, however, all its rights under the constitution and laws of the United States. The application was in due form, but contained the following recitals in addition to those required by the statute:

"The Western Union Telegraph Company aforesaid respectfully states and shows that on the 7th day of June, 1867, it duly accepted the terms and conditions of the act of congress of July 24, 1866, entitled 'An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal, military and other purposes,' now embodied in chapter 65, Revised Statutes of the United States, sections 5263 *et seq.*, a certified copy of which said acceptance is

hereto attached and made a part hereof, and thereby became and now is an instrument of interstate commerce and an agency of the United States for the transmission of public business, and entitled to the rights, benefits and privileges conferred by said act of congress.

"That its said lines of telegraph were constructed and are now maintained and operated over the public domain of the United States and over and along the military and post-roads of the United States, declared such by acts of congress, and over, under and across the navigable streams and waters of the United States. And the said company ever since its said acceptance of said act of July 24, 1866, has transmitted and is now transmitting telegraphic communications between the several departments of the government of the United States and their officers and agents, with priority over all other business, and at rates annually fixed by the postmaster-general."

Other conditions of the law were met, except that relating to the payment of the charter fee, and upon consideration of the application the charter board made the following order:

"The board having under consideration the application of the Western Union Telegraph Company, a foreign corporation organized under the laws of the state of New York, for leave to transact the business of a telegraph company in the state of Kansas; and it appearing that said foreign corporation has, in due form of law, filed with the secretary of state a certified copy of its charter, executed by the proper officers of the state of its domicil, and the written consent, irrevocable, of said corporation that actions may be commenced against it in the proper court of any county in this state in which the cause of action may arise, accompanied by the duly certified copy of the resolution of the board of directors of said corporation authorizing the proper officers to execute the same, it is, upon motion, thereupon ordered that said application be granted and that said applicant be authorized and empowered to transact the business of receiving and transmitting messages by telegraph within the state of Kansas and transacting within the said state its business of a telegraph company; provided, that this order shall not take effect and no certificate of such authority shall

issue or be delivered to said company until such applicant shall have paid to the state treasurer of Kansas for the benefit of the permanent school fund the sum of $20,100, being the charter fees provided by law necessary to be paid by a foreign corporation with a capital of $100,000,000.

"It is further understood, ordered and provided that nothing herein contained shall apply to nor be construed as restricting in anywise the transaction by the said applicant of its interstate business nor its business for the federal government; but that this grant of authority and requirement as to payment relate only to the business transacted wholly within the state of Kansas."

The charter fee has not been paid and the defendant refuses to pay it. No certificate of authority to do business in the state has been issued to the defendant by the secretary of state, and the defendant has continued to transact its domestic business as it did before the enactment of the Bush law.

The law in question creates a charter board, to which application must be made for permission to organize a domestic corporation and for permission to do business in the state as a foreign corporation. Section 1332 of Dassler's Statutes of 1905 reads in part as follows:

"Persons seeking to form a private corporation under any of the laws of this state, or any corporation organized under the laws of any other state, territory, or foreign country, and seeking to do business in this state, shall make application to said board, upon blanks supplied by the secretary of state, for permission to organize a corporation, or to engage in business as a foreign corporation in this state. Such application shall set forth— . . . If a corporation organized under the laws of another state, territory, or foreign country, and seeking to do business in this state: (1) A certified copy of its charter or articles of incorporation. (2) The place where its principal office or place of business is to be located. (3) The full nature and character of the business in which it proposes to engage. (4) The names and addresses of the officers, trustees or directors and stockholders of the corporation. (5) A detailed statement of the assets and lia-

bilities of said corporation, and such other information as the board may require in order to determine the solvency of the corporation." (Laws 1898, ch. 10, § 2.)

Section 1333 requires the application to be accompanied by a fee of twenty-five dollars, and requires a foreign corporation seeking to do business in the state to file its irrevocable written consent that the courts of the state may take jurisdiction over it by the service of process on the secretary of state. The section concludes as follows:

"Every foreign corporation now doing business in this state shall, within thirty days from the taking effect of this act, file with the secretary of state its written consent as above specified." (Laws 1898, ch. 10, § 3.)

Provision is made for meetings of the charter board, the investigation of applications, the granting of authority to organize domestic corporations, and the granting of authority to foreign corporations to do business in this state. Sections 1336 and 1339 read as follow:

"Each corporation which has received authority from the charter board to organize shall, before filing its charter with the secretary of state, as provided by law, pay to the state treasurer of Kansas, for the benefit of the permanent school fund, a charter fee of one-tenth of one per cent. of its authorized capital upon the first one hundred thousand dollars of its capital stock, or any part thereof; and upon the next four hundred thousand dollars, or any part thereof, one-twentieth of one per cent.; and for each million or major part thereof over and above the sum of five hundred thousand dollars, two hundred dollars. . . . In addition to the charter fee herein provided, the secretary of state shall collect a fee of two dollars and fifty cents for filing and recording each charter containing not to exceed ten folios, and an additional fee of twenty-five cents for each folio in excess of ten contained in any charter. The fee for filing and recording a charter shall also entitle the corporation to a certified copy of its charter. All the provisions of this act, including the payment of the fees herein provided, shall apply to

foreign corporations seeking to do business in this state, except that, in lieu of their charter, they shall file with the secretary of state a certified copy of their charter, executed by the proper officer of the state, territory or foreign country under whose laws they are incorporated." (Laws 1898, ch. 10, § 6, as amended by Laws 1901, ch. 125, § 1.)

"Any corporation organized under the laws of another state, territory or foreign country and authorized to do business in this state shall be subject to the same provisions, judicial control, restrictions, and penalties, except as herein provided, as corporations organized under the laws of this state." (Laws 1898, ch. 10, § 9.)

Sections 1358 and 1523 require annual statements of the financial condition of the corporation and of certain other facts to be made to the secretary of state, section 1358 concluding as follows:

"Failure to file such statement by any corporation doing business in this state and not organized under the laws of this state shall work a forfeiture of its right or authority to do business in this state, and the charter board may at any time declare such forfeiture, and shall forthwith publish such declaration in the official state paper." (Laws 1898, ch. 10, § 12, as amended by Laws 1901, ch. 125, § 3.)

The defendant insists that this legislation operated prospectively only, and that it was not intended to apply to foreign corporations which at the time the law became operative were enjoying the privilege of doing business within the state. Much is made of the phrase "seeking to do business in this state." It is pointed out that all the regulations for foreign corporations seeking to do business in the state occur in conjunction with those applying to persons who should seek, after the law went into effect, to form new domestic corporations, and it is claimed the concluding portion of section 1333 conclusively indicates that foreign corporations already in the state could perfect their right to remain merely by filing the consent to suit and service there provided for.

This question already has been decided adversely to the defendant in the case of *The State v. Book Co.*, 65 Kan. 847, 69 Pac. 563, where it was said:

"Inasmuch as the defendant had been doing business in this state before the enactment of the law, it contends that it was not 'seeking to do business' here. It contends that the words 'seeking to do business' apply only to corporations which had not theretofore done business, but desired to do it in the future. This is an erroneous view. The statute does not mean thus to discriminate in the requirements of said section 2, and in other like matters, between foreign corporations which had theretofore been doing business here and those which might thereafter apply to do business." (Page 848.)

The expression "seeking to do business" means seeking to do further business as well as seeking to begin doing business. It was the purpose of the legislature to place all foreign corporations in the same attitude as persons seeking to begin business under the organized form of new domestic corporations, and section 1333 merely imposed a special time limit within which foreign corporations should enter consent to the institution of actions against them by service on the secretary of state.

The Bush law was enacted at a special session of the legislature held in the closing days of December, 1898, and in the opening days of January, 1899. Those were golden days for the promoter with his prospectus and "gilt-edged" wares. The pulse of the country was fevered with the excitement of the new industrialism. "Bubbles" were so common and so alluring that it was possible for persons to repeat the exploit of the promoter of old who solicited and obtained funds "for an undertaking which shall in due time be revealed." Within a brief period following the special session of 1898 occurred the so-called "rich men's panic," occasioned by the fact that funds needed for the payment of debts were locked up in watered stocks and overvalued securities, and the whole financial world was

compelled to make a revaluation of all its business en-
terprises.    Many duties were evaded, great injustice
was perpetrated and much fraud was committed
through the shameless and notorious abuse of corporate
forms of organization and of corporate privileges.    The
era was distinguished and will long be remembered on
account of its corporation orgies.

It is a well-known fact of Kansas history that the
legislature of 1898 was distrustful of corporations as
business instrumentalities.    Previous to the time of its
assembling five individuals, without capital or credit,
only three of whom need be residents of the state,
could fill out a blank form, acknowledge the statements
made before a notary, file the document with the secre-
tary of state, pay a dollar, and thereby acquire the
right to exercise all the privileges and powers of a
corporation.    The state had been an open field for the
exploitation of the people, without let or hindrance, by
foreign corporations spawned under laws as liberal
or more lax than our own.    Such 'corporations were
within the legislature's regulating power, and a, series
of laws for that purpose, including the Bush law, was
enacted.    A special tribunal was created to investigate
the legal validity and financial sincerity of all attempts
on the part of foreign corporations to exercise charter
functions here.    That tribunal was charged with the
duty of ascertaining if the body pretending to be a
foreign corporation was such in fact, according to the
law of the state of its claimed origin, if it was or-
ganized for a purpose legal in this state, and if it was
financially trustworthy.    The payment of a graduated
fee to go to the state school fund was required, not
merely as the price of an opportunity, for the law was
intended to eliminate and restrain as much as to invite
and encourage, not merely as a means of revenue, for
the state school fund was the least needy of any of the
public trusts, but as an evidence of good faith and hon-
est purpose to place the energy and ascertained re-
sources of the corporation behind the business in which

it was engaged. Immediate submission to the courts of the state was required; and provision was made for future annual disclosures of the corporate finances, under the penalty of exclusion from the state. The law was a police regulation pure and simple, designed to protect the people from imposition, deception and fraud, and to accomplish its purpose imposed upon every foreign corporation operating in the state at the time of its enactment the necessity of making a request for permission to continue to do business here, so that it might be formally investigated.

The defendant argues further that there is no discrimination in the statute between corporations which, like the defendant, are engaged in interstate commerce, and those which are not so engaged; that there is no segregation of the intrastate from the interstate business of corporations engaged in interstate commerce; that the law must apply to all corporations alike, because it is expressed in general terms; and hence that no interpretation which the charter board might put upon the law could make it effective against the defendant.

The established canons of interpretation require that the law must be upheld if possible. If it regulates interstate commerce it is void. But if it regulates domestic commerce only it is not open to the imputation that it invades a province subject only to laws made by the congress of the United States. The question is, therefore, What does the phrase "business in this state" mean? May it, when applied to commerce, be the equivalent of "business within this state"?

This court has declared too often to make a repetition of the statement necessary here that if an act of the legislature be susceptible of two interpretations, one of which would render it obnoxious to some paramount constitutional provision while the other would place it in harmony with the fundamental law, that interpretation must be preferred which will sustain the act rather than the one which will destroy it. The

court must, therefore, in the discharge of its duty, take it for granted that the legislature did not intend to fly in the face of the federal constitution and try to exclude foreign corporations engaged in interstate commerce from doing interstate business here unless they first procured permission from the charter board.  It must be presumed that the legislature intended to act within the scope of its lawful powers.  No words of the statute may be construed to relate to subjects within the exclusive jurisdiction of congress.  Nothing contained in the act can be viewed as having any relation whatever to the right of the defendant freely to enter the state and here transact all business of an interstate character which it may desire to undertake.  And the court must necessarily hold that the words "business in this state" mean, when applied to commerce, domestic business only—business which originates, is carried on, and is completed, within the jurisdiction of this state.

Some cases are cited by the defendant in which it has been held that state legislatures have mistaken the limits of their authority.  The chief one is *Crutcher v. Kentucky,* 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649. By an act entitled "An act to regulate agencies of foreign express companies" the legislature of the state of Kentucky sought to make it unlawful for the agent of any foreign express company to carry on the business of transportation within the state without first procuring a license.  No discrimination was made between domestic and interstate business, and it was not disputed that interstate commerce was affected.  The court of appeals of Kentucky upheld the act as a valid exercise of the police power, but the supreme court of the United States decided otherwise, and the statute was declared to be invalid as relating to a subject beyond the jurisdiction of the state legislature.

The case of *Crutcher v. Kentucky* was decided May 25, 1891.  The Bush law took effect January 11, 1899. Almost eight years had elapsed since the decision in

*Crutcher v. Kentucky*, and this court declines to impute to the legislature either ignorance of it or a purpose to defy it. It prefers to hold that the legislature intended rather to take advantage of the suggestion made by Mr. Justice Bradley in deciding the case, which, for emphasis, is italicized in the following extract from the opinion of the court, which he delivered:

"We do not think that the difficulty is at all obviated by the fact that the express company, as incidental to its main business, (which is to carry goods between different states,) does also some local business by carrying goods from one point to another within the state of Kentucky. This is, probably, quite as much for the accommodation of the people of that state as for the advantage of the company. But whether so or not, it does not obviate the objection that the regulations as to license and capital stock are imposed as conditions on the company's carrying on the business of interstate commerce, which was manifestly the principal object of its organization. These regulations are clearly a burden and a restriction upon that commerce. Whether intended as such or not, they operate as such. *But taxes or license fees in good faith imposed exclusively on express business carried on wholly within the state would be open to no such objection.*" (Page 59.)

The correct view was taken by the supreme court of Florida in the case of *F. R. Osborne v. The State of Florida,* 33 Fla. 162, 14 South. 588, 25 L. R. A. 120, 39 Am. St. Rep. 99. A statute of that state provided that no person should engage in or manage enumerated classes of business without first procuring a license. The statute further provided that "all express companies doing business in this state" should pay sums graduated according to the population of the cities in which the business was carried on. Penalties were denounced against "any express company" and "any person" knowingly acting as agent for "any express company" that violated the act. The syllabus of the case reads:

"A state cannot tax or regulate interstate commerce, or make the payment of a tax or the taking out of a

license a condition precedent to carrying on interstate commerce. A state statute which does so, either expressly or in effect, is offensive to the commerce clause of the constitution of the United States, and void at least to that extent. The same is true as to foreign commerce.

"A state statute which imposes a tax, in general terms, on the doing of specified kinds of business, or the pursuit of designated occupations, in the state, and requires that a license shall be taken out before any such business or avocation shall be done or engaged in, should not be construed to apply to any business of the kind that may constitute interstate commerce, but only to business that is domestic or state commerce and to persons engaged or intending to engage in such domestic or state business.

"Although interstate commerce cannot be taxed or regulated by state legislation, and the commerce clause of the federal constitution exempts all such commerce from regulation or taxation by state authority, yet the doing of business that constitutes interstate commerce by a person who is also at the same time engaged in business, of the same kind, that constitutes state or local commerce, cannot be made a bar or exemption of the local or state commerce business from taxation or regulation by state authority. . . . *Held*, (*a*) The act does not tax or regulate or apply to interstate commerce, as distinguished from state or local commerce carried on by an express company, but applies only to express business that is local or state commerce. (*b*) That so long as an express company confines its operations to express business that constitutes interstate or foreign commerce it is exempt from the above legislation, but if it engages in business that is state or local, as distinguished from interstate or foreign commerce, it becomes subject to the statute, notwithstanding it may at the same time engage in interstate or foreign commerce."

In the opinion it was said:

"That the commerce clause of the constitution exempts from the burden of state taxation those who confine themselves to interstate commerce is a truth of which, at this day, knowledge must be imputed to the lawmaking power of the states, and in the absence of language that clearly connects such an intent with that power, it should not be held that there was a purpose

to ignore such truth or violate its principles." (Page 193.)

The supreme court of the United States upheld the statute and affirmed the judgment of the state court. (*Osborne v. Florida,* 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586.)

The legislature of the state of Mississippi passed an act which provides as follows:

"That all railroads carrying passengers in this state (other than street railroads) shall provide equal but separate accommodations for the white and colored races, by providing two or more passenger-cars for each passenger-train, or by dividing the passenger-cars by a partition so as to secure separate acommodations."

"All railroad companies that shall refuse or neglect, within sixty days after the approval of this act, to comply with the requirements of section one of this act shall be deemed guilty of a misdemeanor, and shall upon conviction in a court of competent jurisdiction, be fined," etc. (Laws of Mississippi, 1888, ch. 27, §§ 1, 3.)

Language could scarcely be more inclusive than this, but the supreme court of the state of Mississippi held the act to apply to the carrying of passengers from one point to another within the state, and consequently that it was valid. The syllabus reads:

"This section [section 1], so far as it applies to the carrying of passengers traveling wholly within the state, is not in violation of § 8, art. 1, of the constitution of the United States, which grants to congress the right to regulate interstate commence; and this, although the railroad also traverses other states and is engaged regularly in carrying interstate passengers.

"Since it is within the power of the legislature to require railroads to provide separate accommodations for white and colored passengers traveling wholly within this state, § 3 of said act of 1888, which makes it a misdemeanor and punishable for any railroad to refuse or neglect to furnish such separate accommodations, is valid and enforceable by the courts of this state." (*L., N. O. & T. Ry. Co. v. The State,* 66 Miss.

662, 6 South. 203, 5 L. R. A. 132, 14 Am. St. Rep. 599.)

The judgment of the state court was affirmed by the supreme court of the United States in *Louisville &c. Railway Co. v. Mississippi*, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784.

By the revenue law of North Carolina of March 9, 1903, it is provided in schedule B as follows:

"Sec. 26. *Defining taxes under this schedule.* Taxes in this schedule shall be imposed as license tax for the privilege of carrying on the business or doing the act named, and nothing in this act contained shall be construed to relieve any person or corporation from the payment of tax as required in the preceding schedule."

"Sec. 56. *Packing-houses.* Upon every meat packing-house doing business in this state, one hundred dollars for each county in which said business is carried on." (Laws of North Carolina, 1903, p. 247.)

The Armour Packing Company, a corporation organized under the laws of New Jersey, with its principal office and place of business in Kansas, and engaged in interstate commerce, resisted the payment of this tax on the ground that it was not doing a packing-house business in North Carolina and that the tax interfered with interstate commerce. The court said:

"If the business of the defendant was solely that of shipping food products into this state, consigned directly to purchasers on orders previously obtained, it is clear that this would be interstate commerce and a tax laid by the state upon such business would be illegal. But the defendant does a large business within the state, the selling of products already stored here on orders received after these products are thus stored. The tax is laid upon every meat packing-house 'doing business in this state.' The evident meaning of the legislature is to tax the agency 'doing business' within this state and not to lay any tax upon the interstate commerce of shipping products into the state to be directly or indirectly delivered to purchasers whose orders were obtained before the goods were shipped. . . . The defendant *doing business* in this state and the license tax being exacted only by

virtue of its *intra*state business, the first two grounds of objection are overruled." (*Lacy v. Packing Co.*, 134 N. C. 567, 570, 571, 47 S. E. 53.)

This decision was affirmed by the supreme court of the United States in *Armour Packing Co. v. Lacy*, 200 U. S. 226, 26 Sup. Ct. 232, 50 L. Ed. 451.

The case of *Kehrer v. Stewart*, 117 Ga. 969, 44 S. E. 854, arose upon the following state of facts: Nelson Morris & Co., citizens of Illinois, were engaged in the city of Chicago in the business of packing meats for sale and consumption, and also had a place of business in Atlanta, Ga., where they sold their products at wholesale, having in their employ several clerks and helpers, one of whom was Kehrer, who was employed as chief clerk and manager at a salary of twenty-five dollars per week. The firm did not have anywhere within the state of Georgia any packing-house for slaughtering, dressing, curing, packing or manufacturing the products of any animals for food or commercial use, but took orders which were transmitted and filled at Chicago. The meats were sent to Atlanta and there distributed in pursuance of such orders. Certain meats were also shipped from Chicago to Atlanta without a previous sale or contract to sell. These were stored in the Atlanta house of the firm, in the original packages, and were kept for sale, in the ordinary course of trade, as domestic business. They were offered for sale to such customers as might require them, and until sold were stored and preserved and remained the property of the firm. The tax law of Georgia provided that there should be assessed and collected "upon all agents of packing-houses doing business in this state two hundred dollars in each county where said business is carried on." Kehrer paid the tax under protest and sued to recover it, claiming the law conflicted with the commerce clause of the constitution of the United States. The supreme court of Georgia discriminated between the interstate and the domestic business carried on by Kehrer, and

held the law void as to the former but valid as to the latter. This decision governed the disposition of the case in the supreme court of the United States in *Kehrer v. Stewart*, 197 U. S. 60, 25 Sup. Ct. 403, 49 L. Ed. 663.

The state of Texas brought an action to oust the Waters-Pierce Oil Company from doing business in that state on account of a violation of its antitrust law, the penalty clause of which reads as follows:

"Every foreign corporation violating any of the provisions of this act is hereby denied the right and prohibited from doing any business within this state, and it shall be the duty of the attorney-general to enforce this provision by injunction or other proper proceedings." (Laws of Texas, 1895, ch. 83, § 4.)

The defendant was engaged in interstate commerce, but transactions of that character were withdrawn from the consideration of the jury and excepted from the judgment. It was claimed, however, that the statute was void as a regulation of interstate commerce. A judgment of ouster having been approved by the Texas supreme court, a writ of error was granted by the supreme court of the United States, which in finally determining the controversy said:

"The claim is, if we understand it, that the statute prohibits all business of foreign corporations, and hence is unconstitutional as including interstate business, and cannot be limited by judicial construction to local business, and the unconstitutional taint thereby removed. To sustain the contention *United States v. Reese*, 92 U. S. 214, 221, 23 L. Ed. 563; *Trade Mark Cases*, 100 U. S. 82, 25 L. Ed. 550; *United States v. Harris*, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290; *Baldwin v. Franks*, 120 U. S. 678, 7 Sup. Ct. 656, 32 L. Ed. 766, and some other cases are cited. They do not sustain the contention. The interpretation of certain statutes of the United States was involved, and the court finding the meaning of the statutes plain, decided that it could not be changed by construction even to save the statutes from unconstitutionality. This was but an exercise of judicial interpretation.

"The courts of Texas have like power of interpre-

tation of the statutes of Texas. What they say the statutes of that state mean we must accept them to mean, whether it is declared by limiting the objects of their general language or by separating their provisions into valid and invalid parts." (*Waters-Pierce Oil Company v. Texas*, 177 U. S. 28, 42, 20 Sup. Ct. 518, 44 L. Ed. 657.)

In the case of *State v. Rocky Mt. Bell Tel. Co.*, 27 Mont. 394, 71 Pac. 311, the syllabus reads as follows:

"Political code, section 4071, as amended by Act March 6, 1897, providing that every corporation 'doing business in this state' as a telephone company must pay a license, in each county where such business is transacted, of seventy-five cents per year on each instrument in use, is not invalid as regards a telephone company doing business within the state, also engaged in interstate traffic, the statute being intended only to apply to instruments used solely in business within the state."

In the opinion it was said:

"It will be observed that the language in section 4071 above is: 'Every person, corporation or association doing business *in this state* . . . must pay a license . . .' The allegations of the complaint fairly bring the case within the terms of this statute. It is to be presumed that in enacting section 4071 above, and in using therein the term 'doing business in this state,' the legislature did so in view of the constitutional provision conferring upon congress the sole power to regulate interstate commerce, and it will not be implied that it intended to go beyond its lawful powers, in the absence of express statutory terms directly contravening those provisions. In *State ex rel. Beek v. Wagener*, 77 Minn. 483, 80 N. W. 633, 46 L. R. A. 442, 77 Am. St. Rep. 681, it is said: 'And it may further be observed that the statute does not in terms apply to interstate business, and it will not be implied that the legislature intended to go beyond its lawful powers in enacting it. If, therefore, it be held that the legislature could not forbid one to engage in the business of a commission merchant, as to interstate shipments, without compliance with the provisions of the state statute, such statute should be construed to apply only to local or domestic business.' " (Page 401.)

The State v. Telegraph Co.

Chapter 437 of the 1903 statutes of Massachusetts imposes an excise tax on every foreign corporation organized for certain purposes which has a usual place of business within the commonwealth. In an action brought in equity by the attorney-general to enforce this tax it was contended by the defendant, a corporation engaged in interstate commerce, that the statute was void as an interference with interstate commerce. The court said:

"If the statute before us applied to the maintenance of a place of business solely for the purpose of engaging in interstate commerce it would be unconstitutional. *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158. *Norfolk & Western Railroad v. Pennsylvania,* 136 U. S. 114, 10 Sup. Ct. 958, 34 L. Ed. 394. Its language is broad enough to include every corporation which has a usual place of business in the commonwealth, even though it is a common carrier engaged in interstate commerce, and has its place of business here as a necessary means of carrying on this commerce. But it is a rule of law that a statute which would be unconstitutional as applied to a certain class of cases, and is constitutional as applied to another class, may be held to have been intended to apply only to the latter class, if this seems in harmony with the general purpose of the legislature. As was said by Mr. Justice Devens in *Commonwealth v. Gagne,* 153 Mass. 205, 206, 207, 26 N. E. 449, 10 L. R. A. 442: 'Indeed, where two governments, like those of the United States and the commonwealth, exercise their authority within the same territory and over the same citizens, the legislation of that which as to certain subjects is subordinate should be construed with reference to the powers and authority of the superior government, and not be deemed as invading them unless such construction is absolutely demanded.' . . . In accordance with the doctrine referred to in the cases above cited, we are of opinion that the legislature cannot have intended to include in this statute corporations whose usual place of business is established and maintained solely for use in interstate commerce. With this construction of the law, it is plainly constitutional." (*Att'y Gen'l v. Electric Storage Battery Co.,* 188 Mass. 239, 240, 241, 74 N. E. 467.)

In the case of *McCullough v. Virginia,* 172 U. S. 102, 19 Sup. Ct. 134, 43 L. Ed. 382, Mr. Justice Brewer said:

"It is elementary law that every statute is to be read in the light of the constitution. However broad and general its language, it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the legislature to reach. It is the same rule which obtains in the interpretation of any private contract between individuals. That, whatever may be its words, is always to be construed in the light of the statute; of the law then in force; of the circumstances and conditions of the parties. So, although general language was introduced into the statute of 1871, it is not to be read as reaching to matters in respect to which the legislature had no constitutional power, but only as to those matters within its control. And if there were, as it seems there were, certain special taxes and dues which under the existing provisions of the state constitution could not be affected by legislative action, the statute is to be read as though it in terms excluded them from its operation." (Page 112.)

Many other authorities, state and federal, might be adduced to illustrate both the power and the duty of the court in the interpretation of the statute under consideration. The indubitable legal conclusion is that the legislature did not intend to regulate or burden interstate commerce, but had in mind local business only; and, observing the rules of interpretation which lead to this result, it cannot be questioned that the general words of the statute were not intended to apply to the business of the federal government with the defendant, whether such business be confined within the limits of the state or otherwise.

On the other hand, the generally inclusive terms of the Bush act are to be interpreted with reference to the state's plenary power over its own purely internal commerce and over foreign corporations seeking to engage in such commerce. While the subject of the Bush law is the corporate conduct of domestic business, in-

cluding domestic commerce, no distinction is made be-
tween corporations seeking to do that kind of business.
All alike are included within the terms of the law, and
a foreign corporation which is engaged in interstate
commerce must procure a certificate of authority to
engage in business purely local, the same as any other.

It will be observed that the charter board in its order
carefully respected the rights of the defendant as an
instrument of interstate commerce and as an agency
of the government of the United States.    It required
payment of the charter fee solely on account of non-
governmental telegraphic business to be transacted
wholly within the state of Kansas.    In doing this the
board acted upon correct principles, and the defendant
has no reason to complain because the scope of the
order was accurately defined.    The charter board did
not, as the defendant frequently asserts, limit the ap-
plication of the law.    The legislature limited the law,
and the charter board, respecting the bounds set for
its authority, merely limited its order according to law.

The defendant answers further that if the scope,
meaning and purpose of the Bush act be as the court
has declared it transcends the limits of the power of
the state legislature, in that it violates the commerce
clause of the constitution of the United States.    The
right of the state altogether to exclude foreign corpora-
tions from the exercise of corporate franchises within
its borders, or to admit them upon such conditions as
it may see fit to impose, has been vindicated so often
that a brief reference to a limited number of the de-
cided cases will suffice.    In the case of *Paul v. Virginia*,
75 U. S. 168, 19 L. Ed. 352, Mr. Justice Field, speak-
ing for the court, said:

"The corporation being the mere creation of local
law, can have no legal existence beyond the limits of
the sovereignty where created.    As said by this court
in *Bank of Augusta v. Earle*, 38 U. S. 519, 10 L. Ed.
274: 'It must dwell in the place of its creation, and
cannot migrate to another sovereignty.'    The recogni-

tion of its existence even by other states, and the enforcement of its contracts made therein, depend purely upon the comity of those states—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion." (Page 181.)

In the case of *Pembina Mining Co. v. Pennsylvania,* 125 U. S. 181, 8 Sup. Ct. 737, 31 L. Ed. 650, the state of Pennsylvania had exacted a license fee as the condition upon which a corporation organized under the laws of Colorado might have an office within its limits. The court quoted from *Paul v. Virginia,* 75 U. S. 168, 19 L. Ed. 357, and said:

"Therefore, the recognition of its existence in Pennsylvania, even to the limited extent of allowing it to have an office within its limits for the use of its officers, stockholders, agents and employees, was a matter dependent on the will of the state. It could make the grant of the privilege conditional upon the payment of a license tax, and fix the sum according to the amount of the authorized capital of the corporation. The absolute power of exclusion includes the right to allow a conditional and restricted exercise of its corporate powers within the state." (Page 186.)

In the case of *Horn Silver Mining Co. v. New York,* 143 U. S. 305, 12 Sup. Ct. 403, 36 L. Ed. 164, the opinion reads:

"The granting of the rights and privileges which constitute the franchises of a corporation being a matter resting entirely within the control of the legislature,

to be exercised in its good pleasure, it may be accompanied with any such conditions as the legislature may deem most suitable to the public interests and policy. It may impose as a condition of the grant, as well as, also, of its continued exercise, the payment of a specific sum to the state each year, or. a portion of the profits or gross receipts of the corporation, and may prescribe such mode in which the sum shall be ascertained as may be deemed convenient and just. There is no constitutional inhibition against the legislature adopting any mode to arrive at the sum which it will exact as a condition of the creation of the corporation or of its continued existence. There can be, therefore, no possible objection to the validity of the tax prescribed by the statute of New York, so far as it relates to its own corporations. Nor can there be any greater objection to a similar tax upon a foreign corporation doing business by its permission within the state. As to a foreign corporation—and all corporations in states other than the state of its creation are deemed to be foreign corporations—it can claim a right to do business in another state, to any extent, only subject to the conditions imposed by its laws. . . . Having the absolute power of excluding the foreign corporation the state may, of course, impose such conditions upon permitting the corporation to do business within its limits as it may judge expedient; and it may make the grant or privilege dependent upon the payment of a specific license tax, or a sum proportioned to the amount of its capital. No individual member of the corporation, or the corporation itself, can call in question the validity of any exaction which the state may require for the grant of its privileges." (Pages 313, 315.)

In the case of *Hooper v. California,* 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, it was said:

"The state of California has the power to exclude foreign insurance companies altogether from her territory, whether they were formed for the purpose of doing a fire or a marine business. She has the power, if she allows any such companies to enter her confines, to determine the conditions on which the entry shall be made. And, as a necessary consequence of her possession of these powers, she has the right to enforce

any conditions imposed by her laws as preliminary to the transaction of business within, her confines by a foreign corporation, whether the business is to be carried on through officers or through ordinary agents of the company, and she has also the further right to prohibit a citizen from contracting within her jurisdiction with any foreign company which has not acquired the privilege of engaging in business therein, either in his own behalf or through an agent empowered to that end. The power to exclude embraces the power to regulate, to enact and enforce all legislation in regard to things done within the territory of the state which may be directly or incidentally requisite in order to render the enforcement of the conceded power efficacious to the fullest extent." (Page 655.)

In the case of *Security Mutual Life Insurance Co. v. Prewitt,* 202 U. S. 246, 26 Sup. Ct. 619, 50 L. Ed. 1013, the court had under consideration a law which, without requiring a foreign corporation to enter into any agreement not to remove to the federal courts cases commenced against it in the state courts, provided that if a company should remove such a case its license to do business in the state should be revoked. The opinion reads:

"Having the power to prevent a foreign insurance company from doing business at all within the state, we think the state can enact a statute such as is above set forth. . . . As a state has power to refuse permission to a foreign insurance company to do business at all within its confines, and as it has power to withdraw that permission when once given, without stating any reason for its action, the fact that it may give what some may think a poor reason or none for a valid act is immaterial." (Pages 249, 257.)

In all these cases two exceptions to the rule stated were acknowledged. Thus in *Horn Silver Mining Co. v. New York,* 143 U. S. 305, 12 Sup. Ct. 403, 36 L. Ed. 164, the court said:

"Only two exceptions or qualifications have been attached to it in all the numerous adjudications in which the subject has been considered, since the judgment of

this court was announced more than half a century ago in *Bank of Augusta v. Earle,* 13 Pet. 519, 10 L. Ed. 274. One of these qualifications is that the state cannot exclude from its limits a corporation engaged in interstate or foreign commerce, established by the decision in *Pensacola Telegraph Co. v. Western Union Telegraph Co.,* 96 U. S. 1, 12, 24 L. Ed. 708. The other limitation on the power of the state is where the corporation is in the employ of the general government, an obvious exception, first stated, we think, by the late Mr. Justice Bradley in *Stockton v. Baltimore & New York Railroad,* 32 Fed. 9, 14. As that learned justice said: 'If congress should employ a corporation of ship-builders to construct a man-of-war, they would have the right to purchase the necessary timber and iron in any state of the Union.' And this court, in citing this passage, added, 'without the permission and against the prohibition of the state.'" (Page 314.)

Whenever, therefore, interstate commerce has been directly burdened, restricted or impeded, or government business has been directly affected by legislative attempts to license, regulate or tax foreign corporations, the offending statutes have been declared to be invalid.

In the case of *Telegraph Co. v. Texas,* 105 U. S. 460, 26 L. Ed. 1067, a specific tax upon each message transmitted by telegraph beyond the limits of the state, or which officers of the United States sent in the conduct of public business, was held to be unconstitutional. But the court observed:

"It follows that the judgment, so far as it includes the tax on messages sent out of the state, or for the government on public business, is erroneous. The rule that the regulation of commerce which is confined exclusively within the jurisdiction and territory of a state, and does not affect other nations or states or the Indian tribes, that is to say, the purely internal commerce of a state, belongs exclusively to the state, is as well settled as that the regulation of commerce which does affect other nations or states or the Indian tribes belongs to congress. Any tax, therefore, which the state may put on messages sent by private parties,

and not by the agents of the government of the United States, from one place to another exclusively within its own jurisdiction, will not be repugnant to the constitution of the United States." (Page 466.)

The Western Union Telegraph Company established an office in the city of Mobile, Ala., It was required to pay a license tax under a city ordinance which imposed an annual license tax of $225 on all telegraph companies, and the agent of the company was fined for the non-payment of the tax. In an action to recover the fine he pleaded the charter of the company, the nature of its occupation, its acceptance of the act of congress of July 24, 1866, and the fact that his business consisted in transmitting messages to all parts of the United States as well as in Alabama. These facts were held to constitute a good defense to the action, since a general license tax affecting the entire business of a telegraph company, interstate as well as domestic, or internal, is unconstitutional. But the right of the state over its own internal commerce and over matters within its police powers was carefully guarded. The opinion reads:

"The question is squarely presented to us, therefore, whether a state, as a condition of doing business within its jurisdiction, may exact a license tax from a telegraph company a large part of whose business is the transmission of messages from one state to another and between the United States and foreign countries, and which is invested with the powers and privileges conferred by the act of congress passed July 24, 1866, and other acts incorporated in Title LXV of the Revised Statutes? Can a state prohibit such a company from doing such a business within its jurisdiction, unless it will pay a tax and procure a license for the privilege? If it can, it can exclude such companies, and prohibit the transaction of such business altogether. We are not prepared to say that this can be done. . . . But it is urged that a portion of the telegraph company's business is internal to the state of Alabama, and therefore taxable by the state. But that fact does not remove the difficulty. The tax affects the whole business without discrimination. There are sufficient

modes in which the internal business, if not already taxed in some other way, may be subjected to taxation, without the imposition of a tax which covers the entire operations of the company. . . . We may here repeat, what we have so often said before, that this exemption of interstate and foreign commerce from state regulation does not prevent the state from taxing the property of those engaged in such commerce located within the state as the property of other citizens is taxed, nor from regulating matters of local concern which may incidentally affect commerce, such as wharfage, pilotage, and the like. We have recently had before us the question of taxing the property of a telegraph company, in the case of *Western Union Telegraph Co. v. Massachusetts*, 125 U. S. 530." (*Leloup v. Port of Mobile*, 127 U. S. 640, 645, 647, 648, 8 Sup. Ct. 1380, 32 L. Ed. 311.)

The case of *Crutcher v. Kentucky*, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, has been referred to (*ante*, p: 621). The law of Kentucky there brought in question required from the agent of every express company not incorporated by the laws of Kentucky a license from the state auditor before he could carry on any business for his company in the state. Interstate as well as local business was directly affected. The prohibition was against doing any business without a license; therefore the law was declared to be repugnant to the constitution of the United States, but with the reservation in favor of the power of the state to license intrastate business which has been noted.

In many other cases it has been decided that a state cannot exact pay from a foreign corporation for the privilege of conducting interstate commerce within its limits, or deny to a foreign corporation the right to engage in interstate commerce within its territory, and such is the settled law. The subject is discussed in the following, among other, decisions: *Pensacola Tel. Co. v. West., etc. Tel. Co.*, 96 U. S. 1, 24 L. Ed. 708; *Cooper Manufacturing Co. v. Ferguson*, 113 U. S. 727, 5 Sup. Ct. 739, 38 L. Ed. 1137; *Pickard v. Pullman Southern Car Co.*, 117 U. S. 34, 6 Sup. Ct. 635, 29 L. Ed. 785;

*Robbins v. Shelby Taxing District,* 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; *W. U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790; *Asher v. Texas,* 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368; *Stoutenburgh v. Hennick,* 129 U. S. 141, 9 Sup. Ct. 256, 32 L. Ed. 637; *Fritts v. Palmer,* 132 U. S. 282, 10 Sup. Ct. 93, 33 L. Ed. 317; *McCall v. California,* 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 392; *Brennan v. Titusville,* 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; *Atlantic &c. Tel. Co. v. Philadelphia,* 190 U. S. 160, 23 Sup. Ct. 817, 47 L. Ed. 995.

So much being clear, it remains to inquire how far a state may go in regulating or imposing burdens upon the purely domestic business of corporations engaged in interstate commerce.

The *Case of the State Freight Tax,* 82 U. S. 232, 21 L. Ed. 146, involved a statute of the state of Pennsylvania which provided for a tax at certain rates upon every ton of freight transported by any railroad or canal in that state. The Reading Railroad Company made returns to the accounting officers of the state in which it exhibited separately the amount of freight received for transportation which was wholly within the state and the amount of freight brought into or carried out of the state. Payment of the entire tax was resisted upon the ground that it was levied under a statute which regulated interstate commerce. The court stated that it recognized fully the power of each state to tax at its discretion its own internal commerce, and the tax upon the freight carried from point to point within the state was not disturbed, although the law, so far as it applied to articles carried through the state or articles taken up in the state and carried out of it or articles taken up without the state and brought into it, was held to be unconstitutional and void.

In the case of *Ratterman v. Western Union Tel. Co.,* 127 U. S. 411, 8 Sup. Ct. 1127, 32 L. Ed. 229, a single tax was assessed in gross under the laws of the state of Ohio upon the receipts of the defendant which were

derived partly from interstate commerce and partly from commerce within the state. The receipts were capable of separation, and the tax was held to be invalid merely in respect to the proportion which was derived from interstate commerce.

In the case of *W. U. Telegraph Co. v. Alabama*, 132 U. S. 472, 10 Sup. Ct. 161, 33 L. Ed. 409, the state of Alabama imposed a tax "on the gross amount of the receipts by any and every telegraph company derived from the business done by it in this state." A company reported to the board of assessors only its gross receipts from business transacted wholly within the state. The board required a further return of gross receipts from messages carried partly within and partly without the state. The company made such further return, and a tax was imposed upon the gross receipts shown by the two returns. It was held that the tax imposed upon the messages comprised in the second return was unconstitutional, but, inasmuch as the record presented the means by which the receipts arising from internal commerce might be separated from those derived from interstate commerce, the cause was remanded under an order permitting the collection of the legitimate portion of the tax.

These decisions fully established the right of the state to sever for taxing purposes the domestic from the interstate business of a foreign corporation engaged in interstate commerce within its territory, even although the two kinds were carried on indiscriminately at the same time and by the same instrumentalities. `

The authority to treat the domestic part of a foreign corporation's business as segregated from its interstate transactions was next exercised for purposes of regulation which would have been utterly inadmissible if applied to interstate commerce. The case of *Louisville &c. Railway Co. v. Mississippi*, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784, has been referred to (*ante*, p. 625). The railway company owned and operated a

continuous line of road from Memphis to New Orleans.
Under the law of the state of Mississippi, through
which it passed, it was obliged to provide separate ac-
commodations for colored passengers taken up and set
down within the limits of the state. The court con-
ceded that the regulation might be burdensome and en-
tail extra expense, but said:

"In this case the supreme court of Mississippi held
that the statute applied solely to commerce within the
state; and that construction being the construction of
the statute of the state by its highest court, must be
accepted as conclusive here. If it be a matter re-
specting wholly commerce within a state, and not inter-
fering with commerce between the states, then, ob-
viously, there is no violation of the commerce clause of
the federal constitution. Counsel for plaintiff in error
strenuously insists that it does affect and regulate
interstate commerce, but this contention cannot be sus-
tained." (Page 591.)

States next required foreign corporations engaged in
interstate commerce to take out licenses and pay
charges for the privilege of doing intrastate business,
and the laws fixing such conditions and laying such
burdens upon the exercise of corporate power within
the states were approved by the supreme court of the
United States. In the case of *Postal Telegraph Cable
Co. v. Charleston,* 153 U. S. 692, 14 Sup. Ct. 1094, 38
L. Ed. 871, a city ordinance enacted under power con-
ferred by a state statute imposed a license fee of $500
upon a telegraph company which had accepted the pro-
visions of the act of congress of July 24, 1866, and
which was engaged in interstate commerce. The license
fee was required for business done exclusively within
the city and not transacted for the government. It was
argued that, while a state can prohibit a foreign cor-
poration from doing business within its territory or
can impose conditions upon the exercise of its fran-
chises there, such power does not exist when the cor-
poration is engaged in interstate commerce or is an

agent of the United States government. The court held otherwise and sustained the license fee.

The case of *Osborne v. Florida*, 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586, soon followed. The facts sufficiently appear at·page 622, *ante*. In the course of the opinion Mr. Justice Peckham said:

"The supreme court of Florida has construed the ninth section of this act and has held in express terms that it does not apply to or affect in any manner the business of this company which is interstate in its character; that it applies to and affects only its business which is done within the state, or is, as it is termed, 'local' in its character, and it has held that under that statute so long as the express company confines its operations to express business that consists of interstate or foreign commerce it is wholly exempt from the legislation in question. It has added, however, that under the provisions of the statute, if the company engage in business within the state of a local nature as distinguished from an interstate or foreign kind of commerce, it becomes subject to the statute so far only as concerns its local business, notwithstanding it may at the same time engage in interstate or foreign commerce. In other words, this statute as construed by the supreme court of Florida does not exempt the express company from taxation upon its business which is solely within the state, even though at the same time the same company may do a business which is interstate in its character, and that as to the latter kind of business the statute does not apply to or affect it. As thus construed we have no doubt as to the correctness of the decision that the act does not in any manner violate the federal constitution. . . . It has never been held, however, that when the business of the company which·is wholly within the state, is but a mere incident to its interstate business, such fact would furnish any obstacle to the valid taxation by the state of the business of the company which is entirely local. So long as the regulation as to the license or taxation does not refer to and is not imposed upon the business of the company which is interstate, there is no interference with that commerce by the state statute. . . . The statute herein differs from the cases where statutes upon this subject have been held void, because in those cases the statutes prohibited the doing

of any business in the state whatever unless upon the payment of the fee or tax. It was said as to those cases that as the law made the payment of the fee or the obtaining of the license a condition to the right to do any business whatever, whether interstate or purely local, it was on that account a regulation of interstate commerce, and therefore void. Here, however, under the construction as given by the state court the company suffers no harm from the provisions of the statute. It can conduct its interstate business without paying the slightest heed to the act, because it does not apply to or in any degree affect the company in regard to that portion of its business which it has the right to conduct without regulation from the state.

"The company in this case need take out no license and pay no tax for doing interstate business, and the statute is therefore valid." (Pages 654, 655.)

The laws of Mississippi imposed a privilege tax "on each sleeping- and palace-car company carrying passengers from one point to another within the state." The state constitution declared sleeping-car companies to be common carriers. The Pullman Company is an Illinois corporation. Its cars were carried by various railroad companies, and all of them were carried into the state of Mississippi from other states or out of Mississippi to other states. While in transit, however, such cars carried passengers from point to point within the state. In an action to enforce the tax the company pleaded that the receipts from intrastate business did not pay the expenses chargeable against such receipts; that the business within the state was therefore a burden upon the company's interstate traffic, but that the constitutional provision noted compelled it to assume that burden. The plea was held bad on demurrer by the state courts. The supreme court of the United States interpreted the language used by the state supreme court in deciding the case to mean that the state constitution did not oblige the defendant to do local business, and proceeding upon that assumption affirmed the judgment and said:

"If the Pullman Company, whether called a common carrier or not, had the right to choose between what

The State v. Telegraph Co.

points it would carry, and therefore to give up the carriage of passengers from one point to another within the state, the case is governed by *Osborne v. Florida,* 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586. The company cannot complain of being taxed for the privilege of doing a local business which it is free to renounce. Both parties agree that the tax is a privilege tax." (*Pullman Co. v. Adams,* 189 U. S. 420, 422, 23 Sup. Ct. 494, 47 L. Ed. 877.)

The case of *Allen v. Pullman Company,* 191 U. S. 171, 24 Sup. Ct. 39, 48 L. Ed. 134, is similar in all respects to that of *Pullman Co. v. Adams,* just referred to, the state of Tennessee having passed a statute like that of the state of Mississippi. The decision was rested upon *Osborne v. Florida,* 164 U. S. 650, and *Pullman Co. v. Adams,* the court saying:

"Its terms apply strictly to business done in the transportation of passengers taken up at one point in the state and transported wholly within the state to another point therein. It is not necessary to review the numerous cases in this court in which attempts by the states to control or regulate interstate commerce have been the subject of consideration. While they show a zealous care to preserve the exclusive right of congress to regulate interstate traffic, the corresponding right of the state to tax and control the internal business of the state, although thereby foreign or interstate commerce may be indirectly affected, has been recognized with equal clearness." (Page 180.)

The case of *Kehrer v. Stewart,* 197 U. S. 60, 25 Sup. Ct. 403, 49 L. Ed. 663, reinforces the doctrine under consideration. The facts and the conclusion of the court are stated at page 626, *ante.* In the opinion it was said:

"In carrying on the domestic business, petitioner was indistinguishable from the ordinary butcher, who slaughters cattle and sells their carcasses, and in principle it made no difference that the cattle were slaughtered in Chicago and their carcasses sent to Atlanta for sale and consumption in the ordinary course of trade. Upon arrival there they became a part of the taxable property of the state. It made no difference whence they came and to whom they were ulti-

mately sold, or whether the domestic and interstate business were carried on in the same or different buildings. . . . The record does not show what proportion of such business is interstate and what proportion is domestic, although it is conceded that most of the business is interstate in its character. If the amount of domestic business were purely nominal, as, for instance, if the consignee of a shipment made in Chicago upon an order filled there refused the goods shipped, and the only way of disposing of them was by sales at Atlanta, this might be held to be strictly incidental to an interstate business, and in reality a part of it, as we held in *Crutcher v. Kentucky,* 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649; but if the agent carried on a definite, though a minor, part of his business in the state by the sales of meat there, he would not escape the payment of the tax, since the greater or less magnitude of the business cuts no figure in the imposition of the tax. There could be no doubt whatever that, if the agent carried on his interstate and domestic business in two distinct establishments, one would be subject and the other would not be subject to the tax, and in our view it makes no difference that the two branches of business are carried on in the same establishment." (Pages 65, 68.)

The case of *Armour Packing Co. v. Lacy,* 200 U. S. 226, 26 Sup. Ct. 232, 50 L. Ed. 451, the facts of which have been stated (*ante,* p. 625), follows *Osborne v. Florida,* 164 U. S. 650, and *Kehrer v. Stewart,* 197 U. S. 60.

Finally, it has been decided that a foreign corporation engaged in interstate commerce may be ousted from the franchise of doing local business if it violates the conditions attached to the permission granted it to do business within the state. In the application of remedies corporate business is not to be treated as an entity, but state and interstate classes are distinguishable and separable.

In the case of *Waters-Pierce Oil Company v. Texas,* 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657, referred to at page 627, *ante,* the state made it a condition upon the exercise by a foreign corporation of its corporate franchises within the limits of the state that it should

not make certain kinds of contracts believed by the state to be inimical to the prosperity of its people. The penalty for a breach of the condition was exclusion from intrastate business. The company claimed that its unrestricted right to do interstate business drew to it the right to be unregulated concerning its local business, just as the defendant in this case claims the unconditional right to do local business in Kansas. In denying the legal validity of this claim the court went back to the decisions in *Bank of Augusta v. Earle,* 38 U. S. 519, 10 L. Ed. 274; *Paul v. Virginia,* 75 U. S. 168, 19 L. Ed. 357, *Pembina Mining Co. v. Pennsylvania,* 125 U. S. 181, 8 Sup. Ct. 737, 31 L. Ed. 650, and *Hooper v. California,* 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, and reasserted the doctrine they had established: that since the states may exclude foreign corporations entirely they may attach whatever terms and conditions they choose to admission. In affirming a judgment of ouster as to intrastate business, which, however, left the defendant free to carry on interstate commerce, the court said:

"The plaintiff in error is a foreign corporation, and what right of contracting has it in the state of Texas? This is the only inquiry, and it cannot find an answer in the rights of natural persons. It can only find an answer in the rights of corporations and the power of the state over them. What those rights are and what that power is has often been declared by this court.

"A corporation is the creature of the law, and none of its powers are original. They are precisely what the incorporating act has made them, and can only be exerted in the manner which that act authorizes. In other words, the state prescribes the purposes of a corporation and the means of executing those purposes. Purposes and means are within the state's control. This is true as to domestic corporations. It has even a broader application to foreign corporations." (Page 43.)

The supreme court of the United States is the final arbiter in controversies of this character. To it is committed the very grave and very delicate task of

drawing the boundary-line between the legal provinces of different sovereignties over the same people in the same territory. Its utterances in cases analogous to the one under consideration have been copiously quoted, in order that its opinions and the reasons upon which they are based may clearly appear. From those utterances the conclusion must follow that the Bush act is not vulnerable to the attack which has been made upon it, and that a judgment of ouster from doing intrastate business may be legally imposed upon a foreign corporation which undertakes to defy its terms.

In the cases of *Pullman Co. v. Adams,* 189 U. S. 420, 23 Sup. Ct. 494; 47 L. Ed. 877, and *Allen v. Pullman Company,* 191 U. S. 171, 24 Sup. Ct. 39, 48 L. Ed. 134, it was said that a state law purporting to license the domestic business only of a corporation engaged in interstate commerce might under certain circumstances be regarded as a disguised attempt to tax interstate commerce, if the statutes of the same state made it compulsory upon a corporation engaged in interstate commerce to carry on that part of its business which is wholly within the state. The defendant pleads in its answer that it is obliged to receive, transmit and deliver messages passing between stations in Kansas. In its brief the statute is cited compelling the defendant under a penalty to establish and maintain a telegraph station at every county-seat town traversed by its lines, with the usual appointments and facilities for the convenience of the public in sending telegrams. There are other laws regulating the service of the defendant to the people of Kansas, and in view of them the defendant pleads that it cannot withdraw from its domestic business unless all such laws are regarded as repealed.

None of the laws referred to is repealed by the charter-board legislation, and none of them limits the right of the defendant to forego its local business if it so desire.

In addition to the state's power to license intrastate

The State v. Telegraph Co.

commerce it has authority under the police power which has been reserved to it to make and enforce local regulations of all the defendant's business which the public comfort, convenience and welfare render necessary. It may require the diligent transmission and delivery of messages directed to points within the state from points without the state, at least so long as congress is silent upon the subject. (*Western Union Telegraph Co. v. James,* 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105.) Within the reservation that they do not encroach upon the free exercise of powers vested in congress the state may make all necessary regulations respecting the buildings, poles and wires of the defendant within its jurisdiction. (*W. U. Telegraph Co. v. Pendleton,* 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187.) It may require the defendant to establish and maintain offices at points which the needs of the public indicate. (*Telegraph Co. v. Railroad Commission,* 74 Miss. 80, 21 South. 15.) It may oblige the defendant to appoint an authorized agent to represent it at a known place of business within the state. (*American Union Telegraph Co. v. Western Union Telegraph Co.,* 67 Ala. 26, 42 Am. Rep. 90.) And it may in addition to ordinary taxation levy a tax upon the defendant to defray the expense of local police supervision. (*Western Union Tel. Co. v. New Hope,* 187 U. S. 419, 23 Sup. Ct. 204, 47 L. Ed. 240; *Atlantic &c. Tel. Co. v. Philadelphia,* 190 U. S. 160, 23 Sup. Ct. 817, 47 L. Ed. 995.) Such regulations are not restrictions upon commerce. They are legitimate exhibitions of the police power, and have a rightful place upon the statute-books, even though they affect incidentally the conduct of interstate business.

The existence of such statutes does not imply that a foreign corporation is obliged to transact local business in opposition to the terms of the state's license laws, and statutes specially applicable to the conduct of intrastate business proceed upon the assumption

that the corporation has qualified itself to do such business. It was not intended that any of the statutes of this state regulating the conduct of the defendant's business here should supersede the charter-board legislation and grant permission to do intrastate business without a certificate of authority. By omitting to prescribe other remedies the legislature intended to leave the state free to enforce the statute by employing any of those which the common law furnishes (*The State v. Book Co.*, 69 Kan. 1, 8, 76 Pac. 411, 1 L. R. A., n. s., 1041), and every corporation failing to obtain a certificate of authority exposes itself, to an action of *quo warranto* or injunction to prevent the further local exercise of corporate privileges and powers. If a certificate of authority has been obtained and the corporation fails to file its annual report the charter board may declare and publish a forfeiture of further right to do business within the state (Dassler's Stat. 1905, § 1358). The Bush act, therefore, is itself an act of exclusion, and it would be absurd indeed to say that a corporation not wishing to comply with its terms may not voluntarily do that which the state will compel it to do—cease the further conduct of local business. If the defendant chooses to withdraw it is no longer subject to the compulsion of statutory regulations applicable to its local business only. It is then, for all purposes of the law, beyond the jurisdiction of the state so far as domestic business is concerned.

The nature of the defendant's business is such that the portion which is confined to the state is at all times distinguishable and separable from that which is interstate in character. The separation of one from the other involves neither effort nor embarrassment. Whenever a message is offered to it for transmission and delivery it shows upon its face whether it is state or interstate, and if it be of the former kind the defendant may simply refuse to receive it. No other obstacle, legal or administrative, to a withdrawal

from local business has been suggested, and the court is aware of nothing which would hinder the defendant from adopting such a course to avoid submission to the payment of the charter fee required of it.

The defendant states in its answer that the receipts from interstate and government business alone are not sufficient at many offices to keep them open; if they are closed the defendant's efficiency as an instrument of interstate commerce and as an agency of the government will be seriously impaired; and if the defendant cannot engage in local business it will be prevented from opening new offices, to the detriment of interstate commerce and the government of the United States. This is a mere attenuation of a claim already considered.

In several of the cases which have been cited the contention was that the local business was not self-sustaining. Hence, it was argued, interstate commerce and government business would be crushed by the burden of the charges necessarily thrown upon them. Here the contention is that interstate commerce and government business will fall if the prop of local business be cut from under them by exacting a license for it. There is no difference in principle between the two positions. The fallacy in each lies in the assumption that corporate business is an entity, each constituent element of which is dependent upon all others, whereas it is divisible into independent portions—intrastate business on the one hand and interstate commerce and government business on the other—as clearly as if they were conducted from different offices and by different instrumentalities.

The defendant forbears to disclose the source from which it derives authority to conduct interstate and departmental business by levying the cost of maintaining facilities for them upon domestic commerce. It has no such legal right. To concede that it has would be to concede to a New York corporation the uncurbed power to regulate the purely private internal

commerce of the state in opposition to the will of its legislature—something which the congress of the United States is impotent to accomplish.

It has been declared in a host of decisions that, in order to affect interstate commerce and government business in the legal sense of the expression, state regulations must impinge directly upon them. Consequences which are indirect, remote and incidental only are not invalidating. Those which the defendant is able to prefigure from the operation of the Bush act are of the negligible kind. No restrictions whatever are imposed upon the maintenance of all the offices which may be necessary or convenient for the conduct of that part of the defendant's business which is under federal control. Having no legal right to enter the state and supply its treasury with funds derived from the conduct of intrastate business, the defendant suffers no injury in the eye of the law if its net income from that source be reduced by the transfer of a portion of it to the state treasury, or if it be cut off altogether. No depredation having been committed upon the defendant, no wrong has been done to any independent enterprise it has undertaken to finance. The state cannot be held responsible because that part of the defendant's business which is under federal control is unprofitable, nor because the defendant cannot or will not engage in it at a loss.

The defendant next pleads its acceptance of the restrictions and obligations contained in the act of congress of July 24, 1866, which reads as follows:

"An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes.

"*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled:* That any telegraph company now organized, or which may hereafter be organized under the laws of any state in this Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public

domain of the United States, over and along any of the military- or post-roads of the United States which have been or may hereafter be declared such by act of congress, and over, under, or across the navigable streams or waters of the United States: Provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military- or post-roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of said lines of telegraph, and may preempt and use such portion of the unoccupied public lands subject to preemption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other.

"SEC. 2. *And be it further enacted,* that telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the postmaster-general.

"SEC. 3. *And be it further enacted,* that the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person: Provided, however, that the United States may at any time after the expiration of five years from the date of the passage of this act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all of said companies at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the postmaster-general of the United States, two by the company interested, and one by the four so previously selected.

"SEC. 4. *And be it further enacted,* that before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the postmaster-general of the restrictions and obligations required by this act." (14 U. S. Stat. at L. p. 221.)

,The claim of the defendant is that this statute was enacted in the exercise of constitutional authority to establish post-offices and post-roads as well as to regulate commerce among the several states; that its purpose was to secure to the people of each state the means of communicating with each other as well as with the people of other states; that upon accepting the terms of the act the defendant became a constituent part of the postal system of the United States, an agency of the government in executing its will within the jurisdiction of states in respect to matters of importance both to the government and to the people; and hence. that Kansas has no control over the defendant's local business within her boundaries.

Although urged with much earnestness and plausibility, the claim is not new. It was first pressed upon the attention of the supreme court of the United States in 1869, by Mr. John P. Usher, in an effort to defeat taxes levied in Douglas, Wyandotte and Jefferson counties in Kansas upon the property of the Union Pacific Railroad Company, Eastern Division. It was said that that company was a part of a railway and telegraph system constructed under the direction and authority of congress for the uses and purposes of the United States in the exercise of its power to provide for the common defense and general welfare of the people of the United States, to regulate commerce among the several states, to establish post-offices and post-roads, to raise and support armies, to suppress insurrection and rebellion and to resist invasion; that it had been adopted as an instrument of the government; and that it was entitled to exercise its franchises free from state burdens. (*Thomson v. Pacific Railroad*, 76 U. S. 579, 19 L. Ed. 792.) The claim was renewed in opposition to a property tax by the Union Pacific Railway Company, which had been incorporated by congress itself for the purpose of constructing a railway and telegraph line to assist in the performance of governmental func-

tions, and it was said that the company would be crippled in the performance of its governmental duties if it were obliged to support the governments of the various states through which its lines ran by contributing to their revenues. (*Railroad Co. v. Peniston*, 85 U. S. 5, 21 L. Ed. 787.) It has since been brought forward to resist state property taxes in general (*W. U. Tel. Co. v. Massachusetts*, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790; *Western Union Tel. Co. v. Gottlieb*, 190 U. S. 412, 23 Sup. Ct. 730, 47 L. Ed. 1116); to resist taxes upon intrastate business apart from interstate and governmental business (*Ratterman v. Western Union Tel. Co.*, 127 U. S. 411, 8 Sup. Ct. 1127, 32 L. Ed. 229; *W. U. Telegraph Co. v. Alabama*, 132 U. S. 472, 10 Sup. Ct. 161, 33 L. Ed. 409); to resist taxes upon intrastate private messages (*Telegraph Co. v. Texas*, 105 U. S. 460, 26 L. Ed. 1067); to resist city license fees (*Postal Telegraph Cable Co. v. Charleston*, 153 U. S. 692, 14 Sup. Ct. 1094, 38 L. Ed. 871); to resist a license tax for the privilege of exercising franchises within a state (*Postal Telegraph Cable Co. v. Adams*, 155 U. S. 688, 15 Sup. Ct. 360, 39 L. Ed. 311); to resist charges by the proprietor of streets for their use (*St. Louis v. Western Union Telegraph Co.*, 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380); to defeat a state law requiring the diligent transmission and delivery of messages sent from other states (*Western Union Telegraph Co. v. James*, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105); and in support of the right to enter upon private property without the consent of the owner (*Western Union Tel. Co. v. Penn. R. R. et al.*, 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312).

The claim has never been recognized further than to prevent a state from excluding telegraph companies from the occupation of post-roads within its limits (*Pensacola Tel. Co. v. West, etc., Tel. Co.*, 96 U. S. 1, 24 L. Ed. 708; *W. U. Tel. Co. v. Massachusetts*, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790), and to keep inter-

state commerce and government business free. (*Telegraph Co. v. Texas,* 105 U. S. 460, 26 L. Ed. 1067; *Ratterman v. Western Union Tel. Co.,* 127 U. S. 411, 8 Sup. Ct. 1127, 32 L. Ed. 229; *Leloup v. Port of Mobile,* 127 U. S. 640, 8 Sup. Ct. 1380, 32 L. Ed. 311.) The right to require municipal licenses for the transaction of local business to be taken out, the right to require the payment of state-privilege taxes, the right to tax private messages according to the financial needs of the state and the right to regulate the transmission and delivery of private messages are all utterly incompatible with the notion that the defendant is a part of the government's postal system to the extent proposed.

In *Pensacola Tel. Co. v. West., etc., Tel. Co.,* 96 U. S. 1, 24 L. Ed. 708, the power of congress to pass the act of 1866 was rested in part upon the power to establish post-offices and post-roads, and in *Leloup v. Port of Mobile, supra,* it was remarked that communication by telegraph is in the nature of postal service. There can be no doubt that the plenary power of congress over the public domain and navigable waters of the United States, and over its military- and post-roads, gives it the right to permit them to be used by telegraph companies to facilitate the transmission of intelligence; but the transactions of a telegraph company which has availed itself of the privileges conferred by the act are postal only so far as messages are carried for the departments of the United States government and its officers and agents. Such a telegraph company is part of the government establishment only in respect to government business. Intercourse between private parties by means of telegraphic communications is simply commerce, although they are carried over routes which are post-roads, as the carriage of express packages for private parties over post-roads is commerce.

"In *Pensacola Telegraph Co. v. Western Union Telegraph Co.* (96 U. S. 1, 24 L. Ed. 708), this court held

that the telegraph was an instrument of commerce, and that telegraph companies were subject to the regulating power of congress in respect to their foreign and interstate business. A telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods. Both companies are instruments of commerce, and their business is commerce itself. They do their transportation in different ways, and their liabilities are in some respects different, but they are both indispensable to those engaged to any considerable extent in commercial pursuits.

"Congress, to facilitate the erection of telegraph lines, has by statute authorized the use of the public domain and the military- and post-roads, and the crossing of the navigable streams and waters of the United States for that purpose. As a return for this privilege those who avail themselves of it are bound to give the United States precedence in the use of their lines for public business at rates to be fixed by the postmaster-general. Thus, as to government business, companies of this class become government agencies.

"The Western Union Telegraph Company having accepted the restrictions and obligations of this provision by congress, occupies in Texas the position of an instrument of foreign and interstate commerce, and of a government agent for the transmission of messages on public business." (*Telegraph Co. v. Texas,* 105 U. S. 460, 464, 26 L. Ed. 1067.)

The same view was fully elaborated in the case of *W. U. Telegraph Co. v. Pendleton,* 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187, as follows:

"Although intercourse by telegraphic messages between the states is thus held to be interstate commerce, it differs in material particulars from that portion of commerce with foreign countries and between the states which consists in the carriage of persons and the transportation and exchange of commodities, upon which we have been so often called to pass. It differs not only in the subjects which it transmits, but in the means of transmission. Other commerce deals only with persons, or with visible and tangible things. But the telegraph transports nothing visible and tangible; it carries only ideas, wishes, orders, and intelligence.

Other commerce requires the constant attention and supervision of the carrier for the safety of the persons and property carried. The message of the telegraph passes at once beyond the control of the sender, and reaches the office to which it is sent instantaneously. It is plain, from these essentially different characteristics, that the regulations suitable for one of these kinds of commerce would be entirely inapplicable to the other. . . . But with reference to the new species of commerce, consisting of intercourse by telegraphic messages, this court has only in two cases been called upon to inquire into the power of congress and of the state over the subject. In *Pensacola Telegraph Co. v. Western Union Telegraph Co.,* 96 U. S. 1, 24 L. Ed. 708, this court had before it the act of congress of July 24, 1866, 14 Stat. 221, 'to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes,' and it held that the act was constitutional so far as it declared that the erection of telegraph wires should, as against state interference, be free to all who accepted its terms and conditions, and that a telegraph company of one state accepting them could not be excluded by another state from prosecuting its business within her jurisdiction. In *Telegraph Co. v. Texas,* 105 U. S. 460, 26 L. Ed. 1067, from the opinion in which we have quoted above, it was held that a statute of Texas imposing a tax upon every message transmitted by a telegraph company doing business within its limits, so far as it operated on messages sent out of the state, was a regulation of foreign and interstate commerce, and, therefore, beyond the power of the state.

"In these cases the supreme authority of congress over the subject of commerce by the telegraph with foreign countries or among the states is affirmed, whenever that body chooses to exert its power; and it is also held that the states can impose no impediments to the freedom of that commerce. In conformity with these views the attempted regulation by Indiana of the mode in which messages sent by telegraphic companies doing business within her limits shall be delivered in other states cannot be upheld. It is an impediment to the freedom of that form of interstate commerce, which is as much beyond the power of Indiana to inter-

pose as the imposition of a tax by the state of Texas upon every message transmitted by a telegraph company within her limits to other states was beyond her power. Whatever authority the state may possess over the transmission and delivery of messages by telegraph companies within her limits, it does not extend to the delivery of messages in other states." (Pages 356, 358.)

In *Western Union Telegraph Co. v. James,* 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105, involving a state statute regulating the transmission and delivery of messages coming into the state, it was said:

"It has been settled by the adjudications of this court that telegraph lines, when extending through different states, are instruments of commerce which are protected by the above clause in the federal constitution, and that the messages passing over such lines from one state to another constitute a portion of commerce itself. . . . Such messages come within the protecting clause of the constitution just quoted, and if the statute in question can be construed as regulating commerce between the states, the statute would be invalid on that account.

"The congress of the United States, by the act of July 24, 1866, c. 230, 14 Stat. 221, legislated upon the subject of telegraph companies. That legislation has become a part of the United States Revised Statutes, §§ 5263 to 5269, both inclusive. The sections referred to do not, however, touch the subject-matter of the delivery of messages as provided for in the state statute. The provision in the section of the Revised Statutes as to the precedence to be given to the messages of officers of the government in relation to their official business are not inconsistent with or in any manner opposed to the provisions of the Georgia act, nor are they upon the same subject within the meaning of the rule which permits state legislation in some instances only until congress shall have spoken." (Page 654.)

In the case of *Postal Telegraph Cable Co. v. Charleston,* 153 U. S. 692, 14 Sup. Ct. 1094, 38 L. Ed. 871, involving the right to impose a city license for the transaction of local business upon a telegraph company

42—75 KAN.

which had constructed its lines upon post-roads, it was said:

"It is further contended that the ruling of the cited cases does not cover the case of a telegraph company which has constructed its lines along the post-roads in the city of Charleston, and elsewhere, and which is exercising its functions under the act of congress as an agency of the government of the United States. It is obvious that the advantages or privileges that are conferred upon the company by the act of July 24, 1866 (Rev. Stat. §§ 5263-5268), are in the line of authority to construct and maintain its lines as a means or instrument of interstate commerce." (Page 700.)

In the case of *W. U. Telegraph Co. v. Alabama*, 132 U. S. 472, 10 Sup. Ct. 161, 33 L. Ed. 409, it was said:

"That principle is, in regard to telegraph companies which have accepted the provisions of the act of congress of July 24, 1866, sections 5263 to 5268 of the Revised Statutes of the United States, that they shall not be taxed by the authorities of a state for any messages, or receipts arising from messages, from points within the state to points without or from points without the state to points within, but that such taxes may be levied upon all messages carried and delivered exclusively within the state. The foundation of this principle is that messages of the former class are elements of commerce between the states and not subject to legislative control of the states, while the latter class are elements of internal commerce solely within the limits and jurisdiction of the state, and therefore subject to its taxing power. (Page 473.)

In *W. U. Tel. Co. v. Massachusetts*, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, it was said:

"It never could have been intended by the congress of the United States, in conferring upon a corporation of one state the authority to enter the territory of any other state and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the state into which it thus entered." (Page 548.)

And in *Western Union Tel. Co. v. Penn. R. R. et al.*, 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, after a

full review of the previous cases involving the act of 1866, it was said: "We decide the act to be an exercise by congress of its power to withdraw from state interference interstate commerce by telegraph." (Page 571.)

Conceding that the government of the United States may absorb telegraph lines located upon post-roads and fully incorporate them with the postal establishment, it has not yet done so, and the intrastate business of the defendant, aside from messages carried for the government, is domestic commerce and subject to the provisions of the Bush act.

The defense that the defendant came rightfully into the territory of Kansas and has been the beneficiary of certain complaisant acts of the state and territorial legislatures is clearly demurrable. None of those acts has either the form or the effect of a contract exempting the defendant from future legislation made necessary by the needs and changed conditions of the people of Kansas, and rights are not taken from the public or given to a corporation without the clearest disclosure of a positive intention to do so. The defendant came into the state as a foreign corporation and has remained here as a foreign corporation. It came subject to the right to make all necessary modifications of the laws then in existence, and subject to the adoption of future constitutional provisions and future general legislation. The fact that it entered without the payment of license fees gave it no vested right to remain unlicensed. Such a derogation from the power of the legislature must be found in express words somewhere in the constitution or a legislative act, or must follow by implication equally decisive with express words, or it cannot be suffered. Among the numerous decisions of the supreme court of the United States which establish and elaborate these rules are the following: *Home Ins. Co. v. City Council*, 93 U. S. 116, 23 L. Ed. 825; *Doyle v. Continental Ins. Co.*, 94 U. S. 535, 24 L. Ed. 148; *Fertilizing Co. v. Hyde Park*, 97 U. S. 659, 24

L. Ed. 1036; *Newton v. Commissioners*, 100 U. S. 548, 561, 25 L. Ed. 710; *Mutual Life Insurance Co. v. Spratley*, 172 U. S. 602, 19 Sup. Ct. 308, 43 L. Ed. 569; *Louisville and Nash. R'd Co. v. Kentucky*, 183 U. S. 503, 516, 22 Sup. Ct. 95, 46 L. Ed. 298.

In the case of *Mutual Life Insurance Co. v. Spratley*, 172 U. S. 602, 19 Sup. Ct. 308, 43 L. Ed. 569, the opin-ion reads:

"The act of 1875 stated the terms upon compliance with which a foreign corporation should be permitted to do business within the state of Tennessee. There was, however, no contract that those conditions should never be altered, and when pursuant to the provisions of the act of 1875 this power of attorney was given by the corporation the state did not thereby contract that during all of the period within which the company might do business within that state no alteration or modification should be made regarding the conditions as to the service of process upon the company. When therefore in 1887 the legislature passed another act and therein provided for the service of process, no contract between the state and the corporation was violated thereby, or any of its obligations in anywise impaired, for the reason that no contract had ever existed. Instead of a contract, it was a mere license given by the state to a foreign corporation to do business within its limits upon complying with the rules and regulations provided for by law. That law the state was entirely competent to change at any time by a subsequent statute without being amenable to the charge that such subsequent statute impaired the obligation of a contract between the state and the foreign corporation doing business within its borders under the former act.

"Statutes of this kind reflect and execute the general policy of the state upon matters of public interest, and each subsequent legislature has equal power to legislate upon the same subject. The legislature has power at any time to repeal or modify the act granting such permission, making proper provision when necessary in regard to the rights of property of the company already acquired, and protecting such rights from any illegal interference or injury. *Douglas v. Kentucky*, 168 U. S. 488, 18 Sup. Ct. 199, 42 L. Ed. 553. The cases showing the right of a state to grant or refuse permission to a foreign corporation of this kind to do business within

its limits are collected in *Hooper v. California,* 155 U. S. 648, 652, 15 Sup. Ct. 207, 39 L. Ed. 297.

"Having the right to impose such terms as it may see fit upon a corporation of this kind as a condition upon which it will permit the corporation to do business within its borders, the state is not thereafter and perpetually confined to those conditions which it made at the time that a foreign corporation may have availed itself of the right given by the state, but it may alter them at its pleasure. In all such cases there can be no contract springing from a compliance with the terms of the act, and no irrepealable law, because they are what is termed 'governmental subjects,' and hence within the category which permits the legislature of a state to legislate upon those subjects from time to time as the public interests may seem to it to require." (Page 620.)

Another defense made in the answer is that the defendant is a person within the jurisdiction of the state according to the meaning of the first section of the fourteenth amendment to the constitution of the United States, and as such is entitled to the equal protection of the laws, and that the Bush act discriminates between the defendant and corporations—including telegraph companies—organized in Kansas, in that it must pay a charter fee based upon its entire capital, representing all its property, the major part of which is in other states, while Kansas corporations pay only on capital employed within the state.

It may be observed that so far as doing local nongovernmental business is concerned the defendant is not a person within the jurisdiction of the state until it complies with the law and obtains permission to come into the state. (*Blake v. McClung,* 172 U. S. 239, 259, 19 Sup. Ct. 165, 43 L. Ed. 432.) Besides this, the state is not prohibited from discriminating between its own and foreign corporations in respect to the privileges it may grant to foreign corporations as conditions upon their entering the state to do business, and any restriction it may impose as a requirement of admission, including charges computed upon capital stock, does not

violate the constitutional provision invoked. (*Pembina Mining Co. v. Pennsylvania,* 125 U. S. 181, 189, 8 Sup. Ct. 737, 31 L. Ed. 650; *Horn Silver Mining Co. v. New York,* 143 U. S. 305, 313, 315, 12 Sup. Ct. 403, 36 L. Ed. 164.) But waiving these considerations the answer distorts the statute. The legislature might have graduated charter fees upon the basis of capital or property employed in the state, but it did not choose to do so. It levied a fixed percentage upon the amount of capital stock stated in the charter, irrespective of how much or how little the corporation may determine to employ within the state, and this percentage is the same for domestic and foreign corporations. The same rule applies to all, and there is no discrimination. (*Kehrer v. Stewart,* 197 U. S. 60, 69, 25 Sup. Ct. 403, 49 L. Ed. 663.)

Further answering, the defendant says that it pays all the usual state, county and municipal taxes assessed upon its property; that the charter fee is an additional burden which, being levied upon its entire capital, is, convertibly, levied upon the property in which such capital is invested; and that the imposition of such burden upon property permanently outside the state deprives it of such property without due process of law.

The principle is too elementary to need fortification by the citation of authorities that license fees for the privilege of entering the state and exercising corporate franchises there may be exacted in addition to general taxes upon property in the state, and the collection of such fees involves no attempt on the part of the state levying them to extend its taxing power beyond its territorial limits. (*Ashley v. Ryan,* 153 U. S. 436, 14 Sup. Ct. 865, 38 L. Ed. 773.)

All persons seeking to form corporations and all foreign corporations seeking to do business in the state must get the money somewhere to pay charter fees, but no matter from what property or resources the funds for this purpose are derived the state has laid no tax upon them. It may lawfully fix the terms upon which

corporate franchises may be granted or may be exercised within its borders. Persons seeking to form corporations or foreign corporations seeking to be admitted into the state may submit or not as they choose. But if they do accept the state's terms the use of resources in the voluntary payment of the price of a desired privilege is not deprivation within the meaning of the constitution.

The answer finally states that if intrastate business be relinquished or be withdrawn from the defendant those offices must close which cannot be supported except by receipts from such business; that the defendant's poles and wires are not removable without great loss, their chief value consisting in their use as now established; and hence that the defendant will be deprived of property without due process of law.

As before indicated, the defendant erected its poles and wires subject to the reserved right of the state to make all regulations respecting them which the public interest might warrant, including the imposition of license fees for the privilege of maintaining and using them. The power to require licenses to be taken out is a police power, although exercised for the purpose of raising revenue. (*Wiggins Ferry Co. v. East St. Louis,* 107 U. S. 365, 373, 2 Sup. Ct. 257, 27 L. Ed. 419; *Gundling v. Chicago,* 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725.) Under the well-understood rule the fourteenth amendment to the constitution of the United States offers no obstacles to the exercise of such authority, and if the defendant were obliged to close all its offices on account of the enforcement of the Bush law the state would deprive it of none of its property without due process of law.

The demurrer to the defendant's answer is sustained. The defendant having indicated an intention to rest the case upon the legal sufficiency of its answer, judgment is rendered in favor of the state as prayed for in the petition, and for costs of suit.